LUCIEN S. SMITH vs. ABRAM W. COLLINS & others.

Suffolk.   March 30. — June 29, 1874.   AMES & DEVENS, JJ., absent.

Whether money lent to a member of a firm is advanced upon his credit or upon that of the firm of which he is a member, and whether the individual check of such person given for the loan is so far payment thereof, as to leave the creditor no recourse to the firm, are questions of fact depending upon the intent, understanding and agreement of the parties.

On an exception to a refusal to rule that upon all the evidence the plaintiff had not established his case, the weight of the evidence will not be considered, but only whether there was any evidence to warrant a verdict.

In a suit by A. against alleged copartners, where the issues, whether the alleged partnership in which the individual partners were authorized to borrow money on the credit of the firm existed in fact, and whether the alleged partners represented to A. that it did, are presented together, the separate admissions of the alleged partners, made to third persons, are competent to charge them respectively upon the first, but not upon the second issue ; but declarations made to A. are competent upon both issues to charge the person making them.

For the purpose of showing the nature and scope of an alleged partnership, evidence of the common and usual dealings of persons engaged in the same business in the same locality, is competent.

A partnership in the business of buying and selling cattle is a trading partnership, one of the incidents of which is the right to borrow money for the purposes of the business.

Statements made by an alleged partner at the time that a loan is obtained, showing that the money is for the use of the alleged firm, are part of the *res gestœ*, and are competent to charge the other partners in a suit to recover the money lent, if the fact that the several individuals are partners, or that they have so held themselves out to the person making the loan, is established.

An exception to the exclusion of testimony cannot be sustained unless the bill of exceptions shows that the excepting party was necessarily injured by such exclusion.

CONTRACT against Abram W. Collins, Amos M. Drake and Norman F. Newton, to recover the sum of $7000, and the sum of $12,000, alleged to have been lent to them as copartners by the plaintiff.   Newton made no defence.   The defendants Collins and Drake in their answers denied that they were partners with Newton.

At the trial in this court, before *Wells*, J., the jury found for the plaintiff, and a bill of exceptions was allowed.   On a motion for a new trial, the verdict was set aside as to Collins, and so much of the bill of exceptions as bears upon the question of the liability of Drake, is in substance as follows :

The plaintiff contended that the first loan of $7000 was made to Drake July 30, 1870 ; and that the second loan of $12,000 was

made to Newton September 12, 1870. Both loans were made at Albany, in the State of New York. Newton failed in business September 14, 1870.

The plaintiff was a dealer in hogs and cattle, living in Albany, New York. Collins and Drake were dealers in hogs, and occasionally in cattle, and lived in Brighton, Massachusetts. Newton was a cattle dealer, and lived in Boston. Collins and Drake had been in business as partners for many years.

The plaintiff testified in substance as follows: I have known Drake twenty-five or thirty years. He married my sister. Before 1870, I had a great deal of business with Drake and Collins as partners. I also have had business with Drake alone, and with Collins alone. I met Drake in July, 1870, at West Albany, at the cattle yards. He said to me, " If we want some money, can you lend it to us ? " I said I could. Drake said, " I will let you know in half an hour." Did not say who " us " were. Fifteen minutes later Drake came back, and said, " Can you lend us $7000 ? " I told him I would, went into the hotel and wrote a check for $7000 to A. M. Drake, or order or bearer, and signed it. Drake indorsed it and it was paid. Drake came to my house that evening, and in conversation there said that he and Collins and Newton were in the cattle business together, were doing well and making money. I had never had any business with Newton at that time ; merely knew him to pass the time of day. Drake said, " We are buying cattle, making a nice thing of it. Being in with Newton makes it better, as we do not have to go to Albany so often. Newton has a good commission trade." Drake also said, " If Newton should be in Albany and want money, you can let him have it. It will be all right." " I don't know Mr. Newton," I said. Drake said, " Newton is as good as old gold ; and if not, Collins and I are with him, and you know we're good." This was on Saturday night. On Monday morning Drake brought me a check to keep to show that he (or they) had had the $7000. His name was on it.

Drake wrote me a letter ; this is the letter.* Collins brought it to me at West Albany, I should think, on August 14 or 15.

---

* This letter is dated at Brighton, August 12, 1870. The material portions are " Mr. Newton said he would pay you the $7000 that we owe you, to-day, and the interest. A. W. C. will be up to-morrow, early. My note will come

Drake told me whenever I wanted money to speak to Newton if he or Collins were not up; and I did speak to Newton on August 29, and told him I wanted some money. He said he could let me have $1000, if that would be enough. I told him it would, and he told me to draw on Swan & Newton for $1000, which I did and got the money.

On September 5, I met Drake at Albany, and told him I wanted some money. He said, "I'll get it for you in a few minutes." He found Newton, and they paid me fifty dollars in money for interest. One of them handed me out a New York draft for $2000. Drake passed me out Newton's check for $2000 on the National Market Bank, Brighton. They told me to draw on Swan & Newton for $2000. I agreed not to draw until next day, to give them a chance to sell their cattle. Newton's check for $2000 I agreed to hold; they asked me to. It was given to me by Drake, and he told me I was to hold it, and one or the other of them would bring me up the money the next week. I have had it in my possession ever since; have never indorsed it. I did draw on Swan & Newton for $2000, and they paid the draft, but have since demanded it of me, and claim that I must pay it back. After we had got this all settled up, Drake said to me, " If Newton wants money at any time and we are not here, all right, let him have it; we are good. We'll pay it."

I was at West Albany, September 10, and saw Newton. I asked him if the money had been sent up for the check. He said they hadn't come up, that probably Collins or Drake would be up in the morning; but if they didn't come he should have to borrow some money. Asked if I had any. I told him I had. This was on Saturday. On Monday he came to me and told me neither Collins nor Drake had come up; and asked me if I could get him the money on a check which he had with him and showed me. I asked him particularly how much money he wanted, and what he wanted it for. He said he wanted $12,000, and that he wanted it to pay a note at the Exchange Bank in Albany, which had been given to pay for cattle he had had with Collins and Drake some time previous. He said he would give a check for

_____

due before I come up, and if you will put your name on this one, it shall not cost you anything but the time to write it."

$14,000, and that would cover the $2000 check not paid. I went with him to my bank and got a cashier's check for $12,000, payable to me, and indorsed and gave it to him. The check was paid, and the amount of it was charged to me in my account at my bank. None of this $12,000 has been repaid to me, and none of the $7000 has been repaid to me, except as I have stated.

On cross-examination the plaintiff testified: I had known Newton by sight for five or six years; had heard of Newton and Wales as partners. Drake brought me a check for $7000 after I lent him the $7000. He brought it to me as a memorandum check. He said I was to hold it and they would bring the money up to me when I wanted it. I gave that check back to Drake; didn't see what he did with it. Did not see that it was torn up. He gave it to me on Monday, August 1, in the morning. No, it was not the same day that I lent him the money. I lent that money to Drake and Collins. Drake said, lend us $7000. He did not say who " us " meant. No person was with him. Not a word was said about Newton. Nothing was said about Newton until that evening. He was gone fifteen minutes. He said, " we " want $7000. He did not mention Collins. I let him have it by check on Saturday. He brought me a check on Monday. I knew Collins and Drake had been partners for many years. I used to meet Newton at Brighton and Albany; had heard it reported that he was a partner of Wales. The check he gave me when I lent him the $12,000 was for $14,000. It was protested. It went through the regular course of banking business. The $14,000 check included the $2000 check. Drake borrowed $7000 of me on Saturday, July 30, 1870, at the New York Central Hotel. I know nothing in writing was handed or given me at the time to show for it. I lend money in that way. Drake had asked me that morning if I would lend them some money. I said yes. I gave him a check for $7000. I had $20,000 in the bank. I know that is all of that transaction. Newton was not present at either interview, in my sight. He didn't use Newton's name. He said " us." At that time I supposed he meant Collins and Drake. I let him have the check without taking anything to show for it. On next Monday, he handed me a check signed A. M. Drake and Norman F. Newton. I said it was no matter about any check. He said he thought he would make it good. Had got Newton's

name on it.  I made the remark I did not need any two names.
I was not particular as to two names.  He said he wanted to
make it good.  He said he gave it to me as a memorandum check.
I said I wasn't particular, it was well enough, something like that.
He said he would bring me the money.  He has said over and
over again, that that check was not to be used.  I mean to say,
I understood he was borrowing for Collins and Drake.  He said
" we," "us," and I understood Collins and Drake.  He had told
me they were in business with Newton, Saturday night.  At the
time of borrowing, Newton's name was not mentioned.

I swear it was on September 5 I saw Drake, and he brought
Newton to settle.  I don't remember receiving any letter from
Drake but the one before mentioned, between lending the money
and September 5.  I know I didn't receive any other.

Between July 30, and September 12, I don't remember seeing
Drake more than once.  I might have seen him half a dozen times.
I don't remember any but September 5, now.  The draft for
$1000, on Swan & Newton, was drawn August 29.  I told Newton
I wanted money ; could get along with $1000.  He said they hadn't
sent him up the money as he expected, and I told him I could get
along with $1000.  On September 5, I met Drake, and he went
after Newton.  Drake didn't ask me if Newton had paid the
money ; I met him and told him I wanted it.  They gave me
fifty dollars in money, draft on New York $2000, and this check
signed by Newton, $2000.  Nothing else was given me.  That
check signed by Drake and Newton.  I gave it to them.  That
was not a negotiable check.  It was given as a memorandum
check.  I mean to swear it was not given to be used.  It would
draw the money, if they had any in the bank.  It was given as
memorandum.  Drake said, " Keep that check until next week,
and we will bring the money up or send it to you."  I took New-
ton's check from Drake.  Drake was at my house on July 30.
When Drake told me at my house if Newton wanted any money
to let him have it, I said that I didn't know anything about
Newton financially.  If I let him have any money, I did it on
the strength of Drake and Collins.

In answer to the question why he took Newton's check the
witness testified, " It is customary in that class of people to do it,
to take a check signed by one.  I have lent thousands of dollars

without the scratch of a pen." I didn't ask for Newton's check nor for a receipt. Newton said there was a note in the bank for cattle they had bought, and he wanted the money to pay that note. He said Collins and Drake had the cattle with him. I can't say whether he said his note, or a note in the Exchange Bank. He did say one or the other. I don't know that he did say that the note was protested, or that it was Hunter's note. He said that the note went to pay for cattle that he, Drake and Collins had had some fortnight before. I think he said Exchange Bank.

On reëxamination the witness in answer to the question why he did not have Collins's and Drake's names put on the checks, answered : " Among drovers doing business in the yards, business is never done in that way. I shouldn't think of asking for it. That's the way business is done in all drover yards. I've bought thousands of dollars for myself and partner, and never signed my partner's name. And it's no uncommon thing to lend money without taking receipt. It is done every day."

Prospero L. Eastman, called for the plaintiff, testified, the defendants objecting, that it was not the custom among drovers dealing in cattle to take or give receipts, either in the sale of cattle, or for money lent ; that he was in the cattle yards and saw money lent in all sorts of sums every day, and never saw a receipt given for money so lent. He also testified, on cross-examination : " I have seen as much as $10,000 lent quite often the last five years since I had charge of the yards, and I can't recollect ever seeing any receipt or memorandum given for it. The business is done out of doors. I have lent money in that way myself, and don't recollect ever taking any receipt for it." There was also other testimony reported to the same effect.

George Perkins, called for the plaintiff, testified to seeing Drake on his way to the plaintiff's house in July, 1870, near Albany, and to having a conversation with him, in the course of which Drake showed to the witness a check signed by the plaintiff for $7000, and told him that he had gone into the cattle business with Newton ; that they were doing well and making money ; that they had that day bought one lot of cattle, and made an offer on another, which, however, was held an eighth of a cent higher than

their offer, and Collins would be up in the morning and decide about taking them.

Arthur D. Moore, called for the plaintiff, testified to meeting Drake at Albany, in the latter part of July, or in August, 1870, and Drake's telling him that he had borrowed $7000 of the plaintiff to buy cattle with; but did not tell him with whom. Also that he met Drake again in the latter part of August, or early in September, and talked with him about business, and Drake said he hadn't been up for a couple of weeks, had been to camp-meeting and had a good time, and, the best of it was, they had been making a little money while they were gone; that Drake then said, "I don't know as you know it, but we are in company with Newton buying cattle." He said it wasn't generally known, and he didn't want anything said about it. He also told me of an arrangement he had made with Mr. Smith to let Newton have money if he wanted it to buy more cattle than he could pay for, and neither he, Drake nor Collins were up. He spoke of the hog trade; said there was no money in it. Cross-examination: He said he borrowed $7000 to pay for cattle they had had. I suppose he meant Collins and Drake. In the same conversation he said that Newton was in company with him and Collins. He said the best of it was, they had made a little money while they, Collins and Drake, were at camp-meeting. He said he didn't want me to say anything about it, for it was not generally known.

Nathan B. Ellis, called for the plaintiff, testified, that on the first Sunday after the 25th of August, 1870, Drake said to him that the hog trade was good for nothing; that he and Collins had gone into the cattle trade with Newton; that Newton had $6000 to use of Collins and Drake, and they had borrowed $7000 of Smith. Witness asked Drake why Collins, who had money, wanted to borrow of Smith; to which Drake replied that Smith had money and wasn't using it, but Collins could use his; that Drake also told him that he had made an arrangement with Smith to let Newton have money if he wanted it, and neither he nor Collins was there; that they didn't want it known they were in company together, as Newton didn't want Wales to know of it, as he wouldn't like it. He said he expected Newton would make enough money while they were at camp-meeting to pay their expenses.

The plaintiff also put in evidence an account book owned and kept by the defendant Drake, one page of which, admitted to be in Drake's own handwriting, is as follows :

BRIGHTON, August 5, 1870.

| | |
|---|---|
| Profit brought forward . . . . . . . . | $210 00 |
| Profit, as per Newton's account, on cattle owned with him . | 209 00 |
| | 419 00 |
| | 5 00 |
| | 414 00 |
| | 105 50 |
| | 519 50 |
| Mr. Collins receives one half . . . . . . . | $259 75 |

Settled to date.

BRIGHTON, August 31, 1870.

Upon this testimony, which is all that was offered by the plaintiff and deemed material by either party upon the questions raised, the defendants requested the court to rule that the plaintiff could not maintain his action. The court declined so to rule.

The testimony put in by the defendants, Collins and Drake, tended to show that they were not partners with Newton, but only interested with him in certain specific transactions, and contradicted the evidence put in by the plaintiff in several particulars. This evidence was reported at length, but as it becomes immaterial in the view taken by the court, it is omitted.

Norman F. Newton was not called as a witness for either party.

There was no evidence that any of the cattle bought by Newton were sold by Collins and Drake, or either of them, or that they were received by or sent to them.

There was no evidence, aside from the declarations of Newton to Smith, to show for what purpose Newton borrowed the $12,000, or how he used it ; and there was no evidence of any transaction such as Newton's declaration, testified to by Smith, indicated. Both Collins and Drake denied that there was any such transaction ; and the defendants' counsel contended that there was evidence that showed that it was for a private purpose of Newton's.

The defendants made the following objections :

1. To any evidence of conversations with Drake, to show that Collins, Drake and Newton were partners. Also to the statements made by Newton at the time of the alleged loan of $12,000 ; also to all testimony in relation to the habit, practice or custom of lending money without taking some evidence of it. The court overruled the defendants' objections and admitted the testimony ; but ruled and instructed the jury that no declarations of either would be competent or proper for the consideration of the jury to affect the others, or either of them, upon the question whether such other was a copartner.

2. The defendants offered to prove that two of the plaintiff's witnesses called to prove a partnership of Collins, Drake and Newton, received payments of their claims for cattle sold, shortly before Newton's failure, by them to Newton, during the time of the alleged copartnership, from Wales, Newton's partner, who settled with them after the failure of Newton by paying them fifty cents on the dollar, and that they made no claim for the same upon either Collins or Drake. The court excluded the testimony.

3. The defendants asked the court to rule that as Smith took the check signed by Drake and Newton in their individual names for the $7000, the plaintiff's claim was upon the check, or upon Drake and Newton, and that he could not hold Collins for the same. Also that as the check for $7000 was surrendered by the plaintiff upon the receipt of money for part and of other checks or drafts for the balance of the $7000, the original claim was discharged, and the plaintiff's claim, if any, would be upon such checks or drafts. Also that after the check for $7000 was surrendered, the plaintiff had no claim upon Collins or upon Drake for the $7000, or any part thereof. The court refused to make said rulings or any of them.

4. The defendants also asked the court to rule that, upon the second transaction, of $12,000, the claim of the plaintiff would be upon the $14,000 check, or upon Newton, to whom he lent the money. The court refused so to rule.

5. The defendants also requested the court to rule that upon the plaintiff's evidence, or upon all testimony in the case, the plaintiff never had any claim upon Collins for the $12,000 lent · also that the plaintiff never had any claim upon Drake for the

$12,000 lent, upon the plaintiff's evidence or upon all the testimony in the case. The court refused to make said rulings or any of them.

6. The defendants also requested the court to rule that as the $14,000 check included the $12,000 lent at the time, and also $2000 alleged to remain unpaid on the first transaction, the first sum, of $7000, had been paid, and no action could be maintained against the defendants, Collins and Drake, for that $2000. The court refused to make said rulings or any of them.

7. The defendants also asked the court to rule that there was no evidence in the case that Newton was such a partner of Collins and Drake that he was authorized to borrow money for them. The court refused so to rule.

8. The defendants also asked the court to rule that if there was evidence in the case that Collins or Collins and Drake stated that Newton was their partner to persons other than the plaintiff, such evidence, if believed, does not show that there was such a partnership as authorized Newton to borrow money in their names. The court refused so to rule ; but ruled and instructed the jury that such statements were competent and proper for the consideration of the jury in connection with all the other facts and circumstances of the case, upon the question whether a copartnership existed in fact, such as would authorize Newton to borrow money in behalf and upon the credit of the firm ; but that it was not competent upon the question whether the defendants, Collins and Drake, were liable by reason of having held Newton out as their partner, and thereby induced Smith to trust him.

Upon the third, fourth, fifth and sixth prayers, respectively, the presiding judge ruled that it was a matter of fact, depending upon the intent, understanding and agreement of the parties ; and submitted the several questions to the jury, with instructions adapted to each.

The defendants alleged exceptions.

*T. H. Sweetser & W. Gaston,* for the defendant.

*G. A. Somerby & L. S. Dabney,* for the plaintiff.

COLT, J. The verdict was against Collins and Drake, as partners of Newton in the cattle business. It has been set aside as against the weight of evidence as to Collins on a motion for a new trial. The exceptions remain to be disposed of as to Drake, the only other party defending.

The plaintiff sues for money lent on two occasions to the firm. The first money was paid by him to Drake, the last to Newton. Drake gave the plaintiff a check signed by himself and Newton in their individual names, which the plaintiff testified was a memorandum check to be held by him until the money was repaid. This check was given up on payment of most of the money lent, and on the giving of another check for the balance, signed by Newton alone, which it was contended was also received as a memorandum, and never presented for payment. When the last money was lent the plaintiff took Newton's check for an amount large enough to cover the money then advanced, and the former unpaid check. The last check was protested for non-payment.

It was contended by the defendants that the only remedy of the plaintiff was upon the Newton checks; either because they were taken as payment of the original claim if any against the firm, or because in the original transaction credit was exclusively given to him. But there was evidence that both sums were advanced by the plaintiff solely upon the credit of the firm, and that the checks were not taken by him in payment. This was a question for the jury, depending upon the intent, understanding and agreement of the parties. The presiding judge so ruled and submitted it to them with suitable instructions. *Taylor* v. *Wilson*, 11 Met. 44. *Allen* v. *Coit*, 6 Hill, 318. *Thompson* v. *Percival*, 5 B. & Ad. 925.

The refusal to rule that upon all the evidence the plaintiff had established no claim against Collins and Drake is not open to exception, unless it appears that there was no evidence to warrant the verdict. The question here is not whether the verdict was against the weight of evidence, but whether there is any evidence however slight which, though contradicted by other evidence can properly be submitted to the jury, and upon which they can legally find for the plaintiff. *Forsyth* v. *Hooper*, 11 Allen, 419.

The plaintiff relied on evidence both that the alleged partnership in fact existed, and that Collins and Drake so held themselves out to him at the time of these transactions.

Upon the issues thus presented the declarations and admissions of the alleged partners respectively were properly admitted, and their effect limited by the judge in accordance with established principles. The statements of the individual partners were com

petent to charge them respectively upon the question of the existence of the partnership in fact, and the nature and scope of its business. When made to other persons they were excluded as not competent to show that Collins and Drake were liable by reason of having held Newton out as a partner, and thereby induced the plaintiff to trust him. And the jury were told that the declarations of either would not be competent to prove that the others were his partners. *Currier* v. *Silloway,* 1 Allen, 19. *Fitch* v. *Harrington,* 13 Gray, 468.

For the purpose of showing the nature and scope of the alleged partnership, and the manner of transacting its business, evidence of the common and usual dealings of persons engaged in the cattle business at this locality was competent ; each member of the partnership must be presumed to have intended to clothe the others with all the powers incident to and usually exercised in that business. The evidence tended to show that the cattle business is the business of buying and selling cattle ; that a partnership in such business is a trading partnership, which has the right to borrow money. *Etheridge* v. *Binney,* 9 Pick. 272. *Winship* v. *United States Bank,* 5 Pet. 529, 560. Parke, J., in *Dickinson* v. *Valpy,* 10 B. & C. 128, 140. *Boardman* v. *Gore,* 15 Mass. 331, 340. Story Part. § 126.

The exclusion of the testimony, as to settlements made by two of the witnesses called by the plaintiff to prove the partnership, which was offered to show conduct inconsistent with their testimony, cannot be properly excepted to, because it does not appear that the transactions so settled were such as came within the business of the alleged partnership. They may have been dealings with Newton as a member of another firm, or upon his individual credit. And if so there was no inconsistency apparent in the conduct of the parties.

It was contended that the defendants were interested only in certain specific transactions which did not constitute a general partnership, and did not authorize either one to borrow money on the credit of the others. But upon a careful review of all the evidence we cannot say as matter of law that there was not enough to warrant a verdict for the plaintiff against Drake on one or both grounds upon which a more general partnership was contended for.

It was objected that the judge erroneously admitted the statements of Newton made at the time the last money was advanced as to the purpose for which he borrowed it, showing that it was for the use of the firm. But it is well settled that if Collins and Drake were in fact partners with Newton, or had so held themselves out to the plaintiff, then Newton's statement that he was borrowing the money for the use of the firm is competent against all. It is precisely the same as if he had given the partnership note to the plaintiff, which would be binding on all, notwithstanding a subsequent misapplication of the money. They were statements accompanying the act of borrowing the money, part of the transaction itself, not subsequent admissions, as in *Ostrom* v. *Jacobs*, 9 Met. 454; *Tuttle* v. *Cooper*, 5 Pick. 414, and other cases cited by the defendants. *Etheridge* v. *Binney*, *supra*. *Winship* v. *United States Bank*, *supra*.

*Exceptions overruled.*