Argued October 25, modified as affirmed December 14, 1920.

## ARAMBURN *v.* GUERRICAGOITIA.

(193 Pac. 922.)

**Partnership—Managing Partner may Bind Firm by Chattel Mortgage in Own Name.**

1. Where a partnership had not adopted a firm name, the managing partner, who had authority to transact the business for the firm, could execute a chattel mortgage of the firm property to secure a firm debt in any name he chose to adopt, including his individual name, and such mortgage would bind the other partner.

**Partnership—Chattel Mortgage in Name of One Partner Held Obligation of Firm.**

2. A chattel mortgage of firm property, signed by only one member of the firm in his individual name, is an obligation of the

firm, where that partner had theretofore transacted the business of the firm, including the banking of its money, in his own name, and the mortgage was given to renew the lien of a previous mortgage of the same property, which was signed by both partners.

**Evidence—Fact That Mortgage Pertained to Firm Matters may be Proved by Testimony.**

3. In a suit to foreclose a chattel mortgage of firm property, signed by only one partner in his individual name, the fact that the mortgage and other writings signed by that partner in his own name pertained to partnership matters was properly established. by testimony.

**Partnership—Facts Held not to Show Conspiracy by Mortgagee and Partner to Defraud Other ·Partner.**

4. In suits to foreclose a chattel mortgage of firm property and for an accounting between the partners, the fact that the partner who signed the mortgage for the firm defaulted in the foreclosure suit and retained the attorney for the mortgagee to represent him in the accounting suit does not justify the conclusion that the mortgagee and the partner were working together to defraud the other partner.

From Malheur: DALTON BIGGS, Judge.

In Banc.

This is a suit to foreclose a chattel mortgage upon a band of sheep and the increase and wool thereof, for the sum of $23,049.65 and future advances. From a decree in favor of plaintiff, defendant Loren Goicochea appealed. The plaintiff also prosecuted a cross-appeal.

The controversy involved in this suit arose substantially as follows: About October, 1909, the defendants, Ignacio Guerricagoitia and Loren Goicochea, whom we will hereafter refer to by their first names, agreed to form a partnership and engage in the sheep business. On November 19th of that year the defendants purchased from Frank Aramburn 2,500 ewes and 45 bucks for the sum of $14,290, executed their promissory note for that amount due in four years with interest at the rate of 10 per cent per annum, and as security therefor executed a chattel mortgage on the

sheep. Each of the defendants had an equal interest in the business. On November 21, 1910, Frank Aramburn and these defendants adjusted their business, and found the indebtedness then owing from defendants to Frank Aramburn amounted to $15,794.40. In evidence thereof Ignacio and Loren executed and delivered their promissory note for the amount, payable November 21, 1913, with interest at 10 per cent per annum, the same being signed with the individual names of each. To secure the payment of the note and future advances, not to exceed $5,000, for expenses in running the sheep, defendants executed in their individual names, acknowledged and delivered to Frank Aramburn a chattel mortgage upon the sheep, which was duly filed and recorded. A copy of the mortgage is attached to the complaint, as Exhibit "A." About November 21, 1913, when this obligation became due, Frank Aramburn and Ignacio had an accounting as to the firm's dealings with Frank Aramburn. It was agreed that the amount then owing upon the mortgage, Exhibit "A," was $23,049.65, and a note and chattel mortgage were executed by Ignacio. A copy of this mortgage is attached to the complaint, as Exhibit "B." This mortgage was duly recorded and the prior mortgage, Exhibit "A," was satisfied upon the records.

Loren claims that, as this mortgage was signed by Ignacio alone, it created a lien upon Ignacio's interest in the personal property only, and that Loren is not responsible. It is claimed on behalf of plaintiff that when the prior mortgage, Exhibit "A," became due Frank Aramburn sought a settlement and called on Loren, who would have nothing to do with adjusting and settling the claim; that thereafter he went to

Ignacio and obtained the last-mentioned mortgage; and that the mortgage is that of the partnership.

No written partnership agreement was made between Loren and Ignacio, and no account-books were kept, but they transacted virtually all of the firm's business through the bank and in the name of Ignacio Guerricagoitia, until about June 16, 1913. Ignacio did the principal part of the business, drawing the checks and signing his name thereto, a portion of which were delivered to Loren, signed in blank for him to use.

Prior to November 21, 1910, the firm was doing business with the Capital State Bank, Boise, Idaho, in the name of Ignacio Guerricagoitia: Loren and Ignacio each participated therein, and closed up the account November 21, 1910. Afterwards the firm opened an account with the First National Bank of Boise, Idaho, the first deposit being $1,500, which was an advancement by Frank Aramburn. This firm account was also in the name of Ignacio Guerricagoitia and was used for the firm's business until December 2, 1913. Loren, Ignacio, and Frank Aramburn had notice thereof. In December, 1913, the banking business of the enterprise was transferred to the Quinn River Bank, McDermitt, Nevada. The banking was done under the same name as before.

Both of the partners engaged in the management of the sheep, tending camp and herding, until about June 16, 1913, when Loren became dissatisfied with the management of the business by Ignacio and the financial status, the firm being then in debt in excess of the value of the personal property. He ceased active participation in the partnership business, and engaged in herding sheep for other parties, after

which Ignacio conducted the business as before, until possession of the property was taken by plaintiff under the mortgage. Loren states that Ignacio refused to permit him to work with the sheep any longer. On September 20, 1916, Loren instituted a suit against Ignacio for an accounting of the partnership affairs and for one-half interest of all the profits of the business, and applied for the appointment of a receiver. The court appointed M. G. Hope as such receiver, who took possession of the sheep on November 20, 1917, there being then 2,084 ewes, 988 lambs, 16 wethers, 45 bucks, and camp equipment, horses, etc. By order of the court the personal property was sold for the total sum of $43,732. The sum of $4,807.02, money belonging to the copartnership was also turned over to the receiver. He received $4,009.65, interest on the trust funds, making the total assets of the copartnership $52,548.67. These two suits were practically consolidated in the Circuit Court. They were tried together, and the same decree rendered in each.

In the winter of 1913 and 1914, Frank Aramburn went to Spain, and left his business of assisting in running the sheep with his brother, Amos Aramburn. Early in the year 1916, Frank Aramburn returned to New York, where he died intestate on March 23, 1916. On June 21, 1916, Amos Aramburn was duly appointed as administrator of the estate of Frank Aramburn, deceased, and duly qualified.

On August 16, 1916, Amos Aramburn commenced this suit to foreclose the chattel mortgage lien. On October 15th of that year the administrator took possession of all the personal property described in the two chattel mortgages, which he afterwards turned over to the receiver. The trial court held that the

mortgage of November 21, 1913, created no lien upon the partnership property and decreed that the assets in the hands of a receiver be paid as follows:

| Name of Party. | Amount to be Paid. |
|---|---|
| Amos Aramburn, as administrator of the estate of Frank Aramburn, deceased | $29,506.19 |
| Van Dybe & Young | 241.45 |
| Jesus Yriarte | 600.00 |
| L. Green | 55.00 |
| Amos Aramburn | 1,300.00 |
| E. H. McDonald | 240.00 |
| M. Sullivan | 84.32 |
| Pedro Enchanove | 327.45 |
| Amos Aramburn, costs taxed | 685.00 |
| Loren Goicochea, costs taxed | |
| Ignacio Guerricagoitia, money advanced | 1,266.75 |
| Loren Goicochea, money advanced | 940.00 |

—and that the balance be paid to Loren and Ignacio, in equal amounts to each.

MODIFIED AND AFFIRMED.

For appellant there was a brief over the names of *Mr. Julien A. Hurley* and *Mr. Gus A. Hurley,* with an oral argument by *Mr. Julien A. Hurley.*

For respondent there was a brief and an oral argument by *Mr. G. M. Crandall.*

BEAN, J.—The first question to dispose of is that pertaining to the mortgage of November 21, 1913. It is claimed by appellant Loren that the court erred in decreeing that this mortgage created no lien upon the

property of the defendant Ignacio, and that it was error to decree that any part of the indebtedness of the partnership to plaintiff, amounting to $29,506.19, should be paid by the receiver out of the share claimed by Loren. It is the position of plaintiff upon the cross-appeal that the mortgage of November 21, 1913, created a lien upon all of the partnership property, and that the plaintiff is entitled to the payment of the indebtedness due the estate, with interest and attorneys' fees in this suit.

1. It does not appear that any partnership name was agreed upon between the partners in which to conduct the business, except as the business was transacted in the name of Ignacio Guerricagoitia. Where no name has been fixed by agreement of partners, the partner charged with the duty, or clothed with the authority, to sign contracts for the firm may bind all the members by such signature as he may choose to employ: 30 Cyc. 421. It is unquestioned that one partner may execute a valid mortgage of partnership goods to secure a partnership debt by signing the firm name or the individual names of the members of the firm. One copartner, having authority to pass a valid title to personal property of the partnership by bill of sale, may, as incident thereto, execute a transfer of it in any form or mode by which such title could in any case be legally transferred. It is immaterial whether he sign the name of each copartner separately, or sign the firm name: Jones on Chattel Mortgages (5 ed.), § 46. In 1 Lindley on Partnerships (2 Am. ed.), page 426, we read thus:

"*Firm liable though not named—Written contracts.* If, therefore, one partner only enters into a written contract, the question whether the contract is confined to him, or whether it extends to him and his copart-

ners, cannot be determined simply by the terms of the contract. For supposing a contract to be entered into by one partner in his own name only, still if in fact he was acting as the agent of the firm, his copartners will be in the position of undisclosed principals; and they may therefore be liable to be sued on the contract, although no allusion is made to them in it. * * ''

In a note to this Section at page 428, we read:

''Thus where one partner enters into a simple contract, though in writing, in his individual name, but in fact for his firm, although that fact is not known to the other contracting party, an action may be maintained on it in the name of the firm, by alleging that it was entered into by the firm by the name and style of the name of the one partner, each partner being the agent of the firm: *Havana etc. R. R. Co.* v. *Walsh,* 85 Ill. 58.''

We find it laid down in 1 Rowley, Modern Law of Partnership, Section 265, as follows:

''*Use of firm name.*—In opposition to the doctrine that the name formally adopted as that of the firm must be used in order that the partnership may be bound, the proposition that such symbolical name may be displaced by an effective substitute when the intention of the parties is to bind the firm and the partnership appropriates the consideration, has found favor with a number of courts. 'Partners may bind themselves by other than such prescribed firm name, if they choose to adopt for convenience, or to prevent confusion, a different mode of executing their obligations or contracts from the one prescribed by their original agreement.' And one partner may, if no firm name has been agreed on, bind the firm within the scope of his authority by any name he may select.''

A managing partner may bind the firm by borrowing money, executing notes, and renewing notes, at

least where he has been held out as having such au-
thority: 1 Rowley, Modern Law of Partnership, § 417.
If the name of an individual partner is used as a firm
name, the firm is bound thereby: *Palmer* v. *Stephens,*
1 Denio (N. Y.), 471; *Bank of Rochester* v. *Monteath,*
1 Denio (N. Y.), 402 (43 Am. Dec. 681); *Crable* v.
*O'Connor,* 21 Wyo. 460 (133 Pac. 376).

2. Undoubtedly the indebtedness secured by the
chattel mortgage, Exhibit "B," was that of the firm.
Loren should have known it. There was no new con-
sideration passed. It was but a renewal of the old
mortgage which Loren had signed himself, with the
increase of the indebtedness added. Ignacio was ap-
parently not only authorized to transact the business
of the partnership, but for a long time had been
transacting such business in his name. The chattel
mortgage covered partnership property only. There
is no intervening right of a third party affected. As
between Frank Aramburn, mortgagee, and Ignacio
and Loren, the members of the partnership, the mort-
gage in question created a lien upon the partnership
property described therein for the security of the
partnership indebtedness, and should be foreclosed:
*Hembree* v. *Blackburn,* 16 Or. 153 (19 Pac. 73); *Salt
Lake Brewing Co.* v. *Hawke & Andrews,* 24 Utah, 199,
207 (66 Pac. 1058); *Reynolds* v. *Cleveland,* 4 Cow.
(N. Y.) 282 (15 Am. Dec. 369); *Schemerhorn* v.
*Laine,* 7 Johns. (N. Y.) 311; *Smith* v. *Collins,* 115
Mass. 388; *Pahlman* v. *Taylor,* 75 Ill. 629.

By a long course of dealing the partnership im-
pliedly adopted the name of Ignacio Guerricagoitia as
the partnership name, although there was no express
agreement to that effect. The execution of the note
and mortgage of November 21, 1913, was necessary to
carry on the business of the partnership in the ordi-

nary manner. The transaction was common in the
business in which the firm was engaged, and was well
within the scope of such business. The execution of
the note and chattel mortgage by Ignacio in the inter-
est of, and for the firm, was sufficient to bind both
members of the firm. The firm received the benefit of
the instruments so executed. They were the very
means by which the life of the business was con-
tinued: 30 Cyc. 485, 487.

3, 4. The fact that the writings signed by Ignacio
pertained to partnership matters was properly estab-
lished by the testimony: 20 R. C. L., p. 898, § 109. In
order for Ignacio to secure the payment of the part-
nership debts, it was not absolutely essential to have
the concurrence of Loren: 20 R. C. L., p. 912, § 124.
It is claimed by Loren that Ignacio, Frank Aramburn
before his death, and plaintiff after he assumed con-
trol, were working together to defraud Loren. The
facts as disclosed by the record do not bear out such
claim. It is urged on behalf of Loren that the letter
written by Frank Aramburn from Spain, February
12, 1916, after he heard that Loren was to commence
a lawsuit, tends to show that he was afraid of the re-
sult of litigation. The letter states, in effect, that he
had always treated both Loren and Ignacio well; that
it was not necessary to have a lawsuit, and requested
that none be commenced until he returned. The in-
debtedness of the firm to Aramburn was then great,
and litigation would undoubtedly embarrass Frank
Aramburn and delay a collection, as subsequent
events have proven. Ignacio made no appearance in
the foreclosure suit. He employed the attorney in
the suit for an accounting and dissolution of the
partnership, who represented Aramburn in the fore-
closure suit. This fact is dwelt upon as supporting

the contention made by Loren, but we fail to see that it justifies such a conclusion; there being no clash of interests between Aramburn and Ignacio. The record discloses that Amos Aramburn had been lenient in his dealings with both of the defendants. It is only by reason of the high prices prevailing for sheep and wool at the time they were fortunately sold by the receiver that the mortgagee is able to obtain his money. The failure of the firm to pay the indebtedness necessitated the bringing of this suit, and plaintiff is entitled to recover $1,500, the amount fixed by the trial court but not decreed, as reasonable attorneys' fees. This is in accordance with the tenor of the note and mortgage.

A supplemental complaint was filed, showing that since the filing of the original complaint, and on October 15, 1916, Ignacio being unable to care for the sheep longer, delivered the possession of the mortgaged property to plaintiff. Since that time plaintiff has furnished feed and pasture, herders, camptenders, and camp supplies in caring for the mortgaged property. He sheared and marketed the wool obtained from the sheep in 1917, and expended large sums of money to preserve the property.

Loren, by his answer to the supplemental complaint, claims that the 16,578 pounds of wool sold by plaintiff on June 15, 1917, for 43 cents per pound, amounting to $7,128.54, was on and prior to November 5th and since that time of the value of 60 cents per pound, or the total market value of $9,946.80; that one half of such wool was his property, and was sold without authority; and that he is entitled to one half of the difference between the two mentioned sums, amounting to $1,409.13, which plaintiff should be required to pay him. Loren also claims by this

answer that there are now in the possession of this plaintiff 350 head of ewes of the value of $16 per head, and 75 lambs of the value of $9 per head, which plaintiff failed to deliver to the receiver, one half of which is the property of Loren; and that plaintiff should be required to deliver one half of the sheep to Loren or pay to him the value thereof, $3,175.50. He asks judgment against plaintiff in the sum of $4,584.63. Plaintiff replied to the effect that all the property and money held by him, as mortgagee, was turned over to the receiver.

We have carefully read all of the testimony in the case. It was given by the defendants in the Basque language, through an interpreter, and is conflicting. A statement of the testimony would be difficult and of no value. When Amos Aramburn took possession of the mortgaged property with the consent of Ignacio, no care was taken to count the sheep until shearing time the next season, when 2,377 were counted. He had no other sheep with which they could become mixed, and we think the testimony shows that all of the mortgaged property was delivered to the receiver. The sheep were then carefully counted. If any sheep had been sold, disposed of, or retained by the administrator, it would seem such fact could have been easily ascertained and shown. As to the sale of the wool clip in 1917, the mortgagee acted much the same as it had theretofore been the custom. Defendant Loren has no real complaint to make on account of the difference in market price of wool on the different dates.

It is contended by Loren that there were wethers sold from the band of sheep by Ignacio prior to 1915, when there was such sale made and accounted for. We do not think the claim is sustained, taking into

consideration all of the circumstances and testimony in connection with the matter; the fact that Loren had himself herded the sheep for considerable of the time prior to June, 1913, and was in a position to know of any sale up to that time; that the means of the partnership were limited and they were much of the time running on "low gear," so to speak, and kept the sheep "on the desert" sometimes in winter without feed prepared; and that a number of sheep were lost and others died. We have carefully examined the testimony as to the other items mentioned in the decree. It does not warrant any change in the findings of the lower court.

The decree of the lower court, modified as above indicated, will be affirmed, with directions for the trial court to make such supplemental orders and decrees as may be deemed necessary in winding up the partnership affairs and settling the mortgage, not inconsistent herewith. The costs and disbursements in both of these suits should be paid from the partnership assets.          AFFIRMED AS MODIFIED.